THE DENTZ.[1]

THE PLYMOUTH ROCK.

PENNSYLVANIA R. Co. *v.* THE DENTZ and THE PLYMOUTH ROCK.

(*Circuit Court, S. D. New York.* December 8, 1886.)

**1. COLLISION—STEAMERS—SIGNALS—HELL GATE.**
    In view of the rule of the board of supervising inspectors and the particular circumstances of this case the exchange of signals between steamers passing through Hell Gate, one of which is astern of the other, amounted to an agreement that the vessel astern might precede the vessel ahead by passing upon the port side of the overtaken vessel. Such an agreement implies that the overtaking vessel will in passing fulfill her statutory duty of keeping out of the way of the overtaken vessel, and that the latter will keep her course so far as practicable consistently with the knowledge that the overtaking vessel is to pass her to port. The overtaken vessel has the right to keep in midchannel so long as there is sufficient room on the port side for the overtaking vessel to pass her.

**2. SAME—RULES OF SUPERVISING INSPECTORS.**
    The rules of the board of supervising inspectors, when within the scope of their authority, have the force of statutory rules; but their violation will not charge the vessel violating with damages if the proximate cause of the collision was a faulty maneuver of the other vessel, and the violation of the rule was a remote and not a contributory cause.

[1]Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

3. SAME—APPEAL—COSTS. ,
    If there be enough in the circumstances of the cause to justify the libelants
in joining both vessels as respondents in the district court, and if, upon ap-
peal by one of the respondents to the circuit court, the appellant is adjudged
to be without fault, it is in accordance with equitable principles to so frame
the decree that the costs in the circuit court shall be adjudged against the
guilty vessel, and in favor of the appellant.

4. SAME—SIGNALS BY WHISTLE—VESSEL'S DUTIES.
    Response to a signal by whistle does not imply any relinquishment of the
right of way, excepting so much as may be necessary to enable the overtaking
vessel to execute her maneuver.

In Admiralty. On appeal from decision in 26 Fed. Rep. 40.
*Edwin G. Davis*, for appellant.
*Charles A. Deshen*, for claimant of steam-boat.
*Wilcox, Adams & Macklin*, for libelant and appellee. ·
*Biddle & Ward*, for Pennsylvania R. Co.

WALLACE, J.  This is an appeal by the owners of the tug Dentz
from a decree of the district court pronouncing for the libelant, the
owner of a barge in tow of the tug, against the tug and the steam-
boat Plymouth Rock in a cause of collision.  The collision took place
in the afternoon of September 6, 1884, in the channel of Hell Gate
above Flood rock and between the Gridiron and Hallet's point.  The
libelant's barge was lashed to the port side of the tug, two other tows
being lashed on the starboard side, and while they were proceeding
eastwardly the steam-boat Plymouth Rock, which was also proceed-
ing in the same direction, struck the port side of the stern of the
barge.  As neither the libelant nor the owners of the Plymouth Rock
have appealed, the only question now is whether the Dentz was guilty
of fault contributing to the collision.

The Dentz with her tows had taken the passage between Black-
well's Island and Long Island, and when she had reached a point op-
posite and some 150 to 200 feet away from the Astoria ferry she re-
ceived a signal of two whistles from the Plymouth Rock.  The Ply-
mouth Rock had passed up the channel to the westward of Black-
well's Island, and was then a considerable distance astern of the tug
and tow.  The Dentz immediately answered this signal with two
whistles.  The Pilgrim, another steam-boat, just astern of the Ply-
mouth Rock and on her starboard quarter, was also proceeding east,
and shortly after the exchange of signals between the Dentz and the
Plymouth Rock she gave a signal to the Dentz of one whistle.  The
Dentz replied by one whistle to the signal of the Pilgrim.  The pilots
of the vessels understood these signals to express a proposition on
the part of the Plymouth Rock to pass the tug and tow on the port side,
and of the Pilgrim to pass on the starboard side, and the signal on the
part of the Dentz to be an assent to these propositions.  The proofs
show satisfactorily that from the time the signals were exchanged
between the Dentz and the Plymouth Rock that the Dentz kept the

usual course of a vessel going from the point where she was when signaled through the channel of Hell Gate to the point of collision; that is, that she followed the current of the flood-tide and kept near the middle of the channel, which was about 700 feet wide, and in doing so slowed her engines and kept herself under proper control. The proofs also show that the collision is attributable to the haste and recklessness of those in charge of the Plymouth Rock. The only witnesses for the Plymouth Rock are her pilot and her captain, both of whom assume in their testimony that the collision would not have taken place if the Dentz had kept her course along mid-channel with the true tide. They insist that the Dentz did not do this, and must have starboarded her helm so as to throw herself and her tows across the course of the Plymouth Rock as the latter was passing by Flood rock and along by the Gridiron as near as she could go. This theory is very improbable, and the testimony of the master of the barge, who was an intelligent observer of all that took place after the signals were exchanged, and whose testimony is that of a candid and disinterested witness, is alone sufficient to overthrow it.

The pilot of the Plymouth Rock assumed that his vessel had the right of way, and that the Dentz was bound to give way and keep to the starboard; and in consequence he kept on at full speed, going well out towards the middle of the channel, expecting the Dentz would give way, until it was too late, with the force of the flood-tide, to stop in season to avoid a collision. If the Dentz, by assenting to the signal of the Plymouth Rock, consented to give the right of way to the latter, and obligated herself to keep to the starboard of mid-channel, the decree below was right. The liability of the Dentz to the libelant was placed substantially upon this ground by the court below. The district judge was of the opinion that the Dentz was in fault because by her assent to the proposal of the Plymouth Rock she consented to a violation of rule 7 of the board of supervising inspectors, which in substance forbids steamers attempting to pass each other in going through Hell Gate in either direction; but he also held that by reason of such assent she assumed the obligation of keeping upon the starboard side of the channel all the way around the bend above Flood rock, and he found that she did not keep further to the starboard than the middle of the channel at most. He also held the Plymouth Rock in fault because she violated rule 8 of the board of supervising inspectors, and because she did not stop and reverse in time to avoid the collision when the Dentz was seen by her to be approaching the westerly half of the channel.

The proposition that the Dentz committed a maritime fault by consenting to a violation of the rule of the board of supervising inspectors is fully approved. The language of the rule is plain, and is not fairly capable of the narrow construction contended for by the counsel for the appellant. The rule was designed to prevent just what was attempted in the present case. It is one which the board

of supervising inspectors have competent authority to ordain; and being of that character is as obligatory as any statutory rule. It would probably be held that the vessel consenting to the violation of such a rule would be estopped from asserting the violation as a fault against the other, but that question is not here. The tow did not consent, and the owner can invoke the violation of the rule as a fault on the part of both vessels. The libelant cannot rely upon any antecedent misconduct of the Dentz which did not contribute to the collision; but when it appears that the Dentz has violated a rule which it was her duty to observe she must assume the burden of showing, not only that the act did not probably contribute to the disaster, but that it certainly did not.

It may be assumed that the Plymouth Rock would not have attempted to pass the Dentz in violation of the rule of the board of supervising inspectors without the consent of the Dentz, but if the consent extended no further than an agreement to waive the rule, without relaxing the obligation of the Plymouth Rock not to attempt to pass until she could do so prudently, it is not obvious how the infraction of the rule can be deemed in any aspect a contributory cause of the collision. In such a case the cause of the collision would be the breach of duty of the vessel under obligation to keep out of the way, and the infraction of the rule would be only remote and irrelevant misconduct.

The real question, therefore, is whether the Dentz, by consenting that the Plymouth Rock might pass on her port side, impliedly promised to assist the latter in this movement by changing her own course and keeping to the starboard side of the channel. If she did, it cannot be found upon the proofs that this obligation was fully met. It is evident that the pilot of the Dentz did not understand that he was under the duty of materially changing his course, or suppose that he had absolved the Plymouth Rock from her statutory duty of keeping out of the way. The single inquiry is as to the legal implications properly to be deduced from the exchange of signals.

It is to be assumed that both pilots contracted with reference to the rights and obligations of the respective vessels under the rules on navigation. If the Dentz had not assented to the proposition of the Plymouth Rock, both pilots would have understood that the latter was to keep out of the way as an overtaking vessel, and that the former was to hold her course. But both pilots would also have understood that the Dentz was entitled to the exclusive right to the channel under rule 7 of the board of supervising inspectors, and that the Plymouth Rock could not lawfully attempt to pass at all. There was no signal known to the pilots by which one could ask the other to yield the exclusive right of way, except one which would also indicate the intention of the Plymouth Rock to pass on the one side or the other of the Dentz. The proposition of the Plymouth Rock would therefore seem to have been, "Will you let me pass if I will go on

your port side?" and the signal of the Dentz was an answer in the affirmative. It is not obvious how this proposition and assent can be interpreted otherwise than as an agreement that the Dentz would yield her exclusive right of the way with the understanding that the Plymouth Rock should undertake to pass her on the port side. This agreement would naturally imply that on the one hand the Plymouth Rock as an overtaking vessel should, in passing to the port, fulfill her statutory duty in passing to keep out of the way, and on the other hand that the Dentz should keep her course so far as she could consistently with the knowledge that the Plymouth Rock intended to pass her on the port side. There is no reason why it should be interpreted as requiring the Dentz to yield the mid-channel so long as there was sufficient room left on the port side of the mid-channel for the contemplated movement of the Plymouth Rock. This is quite a different contract from the one to which the Dentz was held in the court below, and which, in effect, was treated as one which required the Dentz to yield the mid-channel, keep on the starboard side of it, give the Plymouth Rock practically the right of way, and absolve the latter from the primary duty of keeping out of the way. Upon the interpretation now placed upon it the pilot of the Dentz was justified in pursuing the course he did, and the pilot of the Plymouth Rock was in the wrong when he supposed that the Dentz was under any other obligation than that of allowing to the Plymouth Rock sufficient room on the port side of the channel to execute her maneuvers. As emphasizing this conclusion the signals which were exchanged between the Dentz and the Pilgrim are significant. It is not clear upon the proofs whether these signals followed those exchanged between the Plymouth Rock and the Dentz so closely as to be almost simultaneous, but they were exchanged before the vessels had reached the more critical point in the passage through Hell Gate; and all the pilots should have understood that the situation required the Dentz so to conduct her movements as to leave room for the Pilgrim to pass upon her starboard side. This could be more safely accomplished by the Dentz following the current of the true tide and keeping near mid-channel.

The case is one where the pilot of the Dentz, from motives of courtesy and to accommodate the Plymouth Rock, and the Pilgrim also, was led to waive his privilege to the exclusive use of the channel as against these steam-boats. Those in charge of the Plymouth Rock, presuming upon his courtesy, recklessly encroached upon the mid-channel, assuming that he would look out for the safety of his tug and tow. They thereby brought about a disaster which it would seem they now attempt to excuse by falsifying the facts.

The contest in this court has been mainly between the Plymouth Rock and the Dentz. There was enough in the facts to justify the libelant in joining the Dentz as a respondent, and testing her liability in the district court. It is in accordance with equitable prin-

ciples that the costs of this court be decreed against the Plymouth Rock in favor of the Dentz.

There will be a decree against the Plymouth Rock in favor of the libelant for the whole damages decreed by the district court, with interest, and the costs of the district court, and in favor of the Dentz for the costs of this court.